JOHN A. NELSON *vs.* RUFUS R. SIMS et al.

In the year 1833, certain lands, that were subject to entry at the land-office in Columbus, Mississippi, were, upon several applications being made to enter the same land, put up and sold to the highest bidder, when S., the defendant in error, became the purchaser *bonâ fide*, and received from the register of the land-office, according to custom, a formal permit, which is called an application for the land purchased ; and this necessary preliminary step being performed, the next one was the payment of the purchase-money for the land to the receiver. *Held*, that the evidence showed that the purchase-money for the land was paid by S., and he took from the receiver proper receipts for the money he had paid.

Upon the presentation of the certificates of the register that S. had made application for the lands described therein, it was the duty of the receiver, upon payment of the purchase-money, to issue his receipts therefor, and on the following day, according to the regulations of the land-office, to hand said receipts to the register, with the written application of the purchaser, and on the payment of the money to deliver duplicate receipts to the purchaser. *Held*, that the application made to the register for the purchase of the land, and the payment of the money to the receiver upon filing with him certificates of application, were a full performance on the part of S., and his duties terminated with the payment of the price of the land to the receiver.

In such case S. was not responsible for what afterwards was to be done by the vendor, and he could not be injured by the ignorance, negligence, or want of fidelity on the part of the government or its officers, and S. was vested with a valid claim to the land unless it can be shown that N., the plaintiff in error, was a *bonâ fide* purchaser without notice of the equitable title which S. held at the time.

It appears that S. informed N. before he entered the land, of his (S.'s) purchase of it before that time, when N. proposed to purchase it but did not : *held*, that N. had notice of the purchase of S.

ON appeal from the northern district vice-chancery court, at Columbus ; Hon. Henry Dickinson, vice-chancellor.

The bill in this case as filed, charges that on the 19th of December, 1833, Edward Sims, of whom the complainants are heirs at law, entered at the land-office in Columbus, four seve-

ral parcels or tracts of land, for all of which he paid and performed all things to entitle him to said land; and at the date of the transaction, the land-office was so loosely and negligently kept, indeed so much confused and disordered, that there is no note or memorandum on any of the books of either the register or receiver of the entry of the lands by Sims.

That defendant, Nelson, well known of Sims' entry, but yet on the 17th day of June, 1834, fraudulently entered the same land, and that said entry is void as made by Nelson, who has received a patent conveying the legal title to him. That Sims exchanged the said lands for others, and gave a warrantee deed, and that a recovery has been had on that warrantee to the amount of $3200, which amount his (Sims') executors have paid and discharged, and which recovery was caused by Nelson holding claim to the lands illegally. An injunction was prayed to prevent Nelson from selling the land, and for a decree vesting the title in complainants, which the vicechancellor granted; from which decree the defendant, Nelson, appealed to this court.

*Boykin & Cruse,* for appellant.

*Guion & Baine* and *Top & Evans,* on the same side.

*Harris & Harrison,* for appellees.

Mr. Chief Justice Smith delivered the opinion of the court.

This bill was filed by the appelles as the heirs of Edward Sims, to prove a conveyance of four eighths of land, from the appellant, John Nelson, who holds the legal title to it. The complainants base their claim to the land upon an alleged purchase from the United States, made at the land-office at Columbus, on the 19th day of December, 1833. On the other hand, the defendant claims the land by virtue of a patent, based upon an entry made at the same office, dated the 19th of July, 1834, and of course subsequent to the purchase or entry of Sims.

It is manifest from this statement, that the case must turn upon the question whether Sims, by means of the alleged entry

or purchase, acquired a valid claim to the land. To determine this question, we must refer to the statute then in force, regulating the disposal of the public lands. The purchase was made under the act of congress passed on the 24th April, 1820. 2 Land L. 324. The second section contains the following directions, to wit: — " That credit shall not be allowed for the purchase-money on the sale of any public lands, which shall be sold after the first day of July next; and that a purchaser at private sale shall produce to the register of the land-office a receipt from the treasurer of the United States, or from the receiver of public moneys of the district, for the amount of the purchase-money on any tract, before he shall enter the same at the land-office."

A literal construction of this statute, as it seems, would require the production and presentation of the treasurer's or receiver's receipt to the register, by the party desirous of making an entry or purchase, as a necessary preliminary step, without which an entry could not be made. But a different construction was put upon this statute very soon after its passage, by the department of the government having a supervisory control over the sales of the public lands. Not however by dispensing with the cash payments required by the act, and which was one of the principal objects which the legislature had in view in its adoption; but by prescribing the formalities necessary to be observed by a person desirous of entering or of purchasing land from the United States. As early as the 29th of May, 1820, the method in which lands must be purchased of the United States, is distinctly prescribed by the treasury department in its circular of that date. That department directs that, " Under the new system an application by an individual to purchase must be in writing; upon that written application, the register will certify the quantity contained in the tract applied for and the price; upon presentation of this to the receiver, he will receive the amount of the purchase-money and issue duplicate receipts, the one to be kept by the purchaser, the other to be left with the register. The written application must be returned to the register to be filed in his office, and when the purchaser receives his patent he must surren-

der his duplicate." 2 Land L. 302. We cannot doubt that these regulations are predicated upon a proper construction of the statute. The principal object, or at least one of the chief objects had in view in the passage of the statute of 1820, was the substitution of the cash system in the sales of the public lands, in lieu of the regulations established by the act of 1800. These regulations effect the purposes of congress in that respect, and obviate the embarrassment, to say the least of it, which might result from the construction which should require the applicant to apply in the first place to the receiver, who would, as a necessary result of that construction, have the authority, and be required to receive the money, and issue his receipt therefor, without a certificate of the register showing that the land applied for was vacant and subject to entry.

On the 25th of May, 1831, very full and minute instructions were given to the registers and receivers, in a circular issued from the treasury department. The instructions embraced almost the entire duties of registers and receivers in regard to the sales of public lands. This circular again requires that applications to purchase lands must be made in writing to the register, who gives to the party a certificate, which is the authority to the receiver to receive the purchase-money, and who issues his receipt therefor ; the duplicate of which he is to hand to the purchaser. The receiver is expressly required to hand over, from day to day to the register, the receipts issued in favor of purchasers. 2 Land L. 444 – 451.

These instructions have, ever since the statute went into operation, regulated the method of proceeding in the purchase and sale of the public lands. They have been based on a construction given to a statute, providing for the sale of government lands by the officers of the government itself. Their validity has never been questioned, as far as we are informed, by any officer or department of the government. On the contrary, they seem to have been regarded by the attorney-general of the United States in many instances as authoritative, and the court, in the case of *Carroll* v. *Safford*, 3 How. S. C. C. R. 441, seems tacitly to have regarded them as valid.

Holding, then, that the instructions are predicated upon a

Nelson *v.* Sims et al.

just construction of the statute, let us see whether the acts necessary to constitute a valid purchase or entry of land were performed by Sims.

The first act to be performed towards the completion of the purchase on his part, was to file a written application for the land. Did Sims do this?

The witness Ready who was in a situation to know, and who did profess to be familiar with Sims' operations at the land sales, says that Sims, after the public sales, applied for sundry lands including those in question; that he intended to bid for those lands if any one else did so, but as there were no bids he let them pass. Applied to enter them after the sales; there were also other applicants for the same lands, or at least a part of them; they were consequently put up to the highest bidder, and struck off to Sims, who received from the register, according to custom, a formal permit, which is called an application, for each eighth. That Sims had obtained from the register quite a number of these applications, and is confident that Sims applied for and entered the lands in question in good faith, and that he paid to the government every dollar of the purchase-money. There is other evidence in the record, corroborating the testimony of this witness, which it is unnecessary to notice, as we deem the fact that an application for the land was made by Sims, is sufficiently proved by him.

The preliminary act necessary to the completion of a purchase or entry of the land was performed by Sims. The next step necessary to be taken was the payment of the purchase-money to the receiver.

In reference to this point, we deem it only necessary to remark, that the evidence is direct and full, that the purchase-money for the land was paid by Sims, and that he took from the receiver the proper receipts, which were on file in the court below.

Upon the presentation of the certificates of the register, that Sims had made application for the lands described therein, it was, as we have seen, the duty of the receiver, upon payment of the money, to issue his receipts therefor, and on the following day, according to the regulations of the land-office, to hand these

receipts to the register, with the written application of the purchaser. It was also his duty, on the payment of the money, to deliver duplicate receipts to the purchasers. 2 Land L. 444.

In our view of the subject, the applications made to the register for the purchase of these lands, and the payment of the money to the receiver upon filing with him the certificates of application, were a full performance of all the acts necessary to a completion of the sale, or entry, on the part of Sims. His duties terminated with the payment of the price of the land to the receiver. He was not responsible for what afterwards was to be done by the vendor; his rights, therefore, so far as the United States were concerned, could not be impaired by the ignorance, negligence or want of fidelity, on the part of the government or its officers.

We hold, therefore, that Sims by these transactions was vested with a valid claim to the land, which we must sustain, unless it is established by the proofs that the defendant was a *bonâ fide* purchaser, without notice of the prior equitable title which Sims held to the land.

We will, in the last place, notice the evidence in reference to the question of notice. The witnesses, Downing and Ready, swear directly and positively, that the defendant had notice of Sims' purchase or entry. The first of these witnesses swears that the defendant stated to him, that he had been informed by Sims himself, that he (Sims) had purchased or entered the land in question; and thinks that he was informed of that fact by the defendant at the time he entered the land. Ready's testimony is not less explicit: he swears, that soon after the land-sales at which Sims purchased the land, defendant "proposed to purchase of Sims the four eighths" in controversy; and remembered being present on one or more occasions when the subject was under consideration. With this evidence there is no testimony in the record that necessarily conflicts. There is some negative testimony, which is entitled to very little weight, if brought in conflict with the direct testimony of these two witnesses whose credibility is entirely unimpeached.

After a careful review of the case, we believe the decree of the vice-chancellor to be correct, and therefore affirm it.

YERGER, J. having been of counsel in the chancery court, took no part in the decision of this case.